[Civ. No. 14663.   Second Dist., Div. One.   Dec. 13, 1944.]

Estate of AUGUST SCHNELL, Deceased.   BEN H. BROWN, as Public Administrator, etc., Appellant, v. WILLIAM SCHNELL et al., Respondents.

Catlin & Catlin, Frank D. Catlin, Henry W. Catlin and William E. Woodroof for Appellant.

Riccardi, Webster & Donahue, Leonard L. Riccardi, Wilton W. Webster and William J. Donahue for Respondents.

YORK, P. J.—Ben H. Brown, as Public Administrator of the County of Los Angeles and the duly appointed administrator of the estate of Anna Schnell, deceased, filed his petition in the estate of August Schnell, predeceased husband of said Anna Schnell, for an order to determine interest therein, alleging that Anna Schnell was the surviving wife of August Schnell; that they had lived together as husband and wife for approximately fifty years; that all of the property in the possession of August Schnell at the time of his death was acquired during the married life of the parties and hence was community property.

Contestants are legatees under the last will of August Schnell, and by their opposition to the petition allege that the property left by August Schnell, deceased, was not community property but his sole and separate property.

The court found, in effect, that while the parties were married in 1893 and lived together as husband and wife until the death of August Schnell on December 1, 1942, that the estate of August Schnell ''does not consist of community property, but on the contrary, consists of the separate property of the said decedent''; that it was not acquired during the married life of said parties; and ''that the Estate of Anna Schnell is not entitled to any part of the property of said August Schnell, deceased.'' Anna Schnell died on December 7, 1942.

From a judgment or decree which was thereafter entered in accordance with the findings, the administrator of the estate of Anna Schnell, deceased, prosecutes this appeal, urging that (1) the direct evidence aided by legal presumptions discloses that all of the property of the estate of the husband was acquired during the married life of the parties; (2) the estate of Anna Schnell, Anna being the surviving widow of August, is entitled to one-half of all the property acquired during the married life of the said parties; (3) the material findings of fact do not conform to nor are they supported by the evidence, and therefore the judgment based thereon cannot be sustained.

■ Appellant also urges that the instant situation is governed by the provisions of section 201.5 of the Probate Code: ''Upon the death of either husband or wife *one-half of all personal property,* wherever situated, heretofore or hereafter

*acquired after* marriage by either husband or wife, or both, *while domiciled elsewhere, which would not have been the separate property of either if acquired while domiciled in this state, shall belong to the surviving spouse;* the other one-half is subject to the testamentary disposition of the decedent, and in the absence thereof goes to the surviving spouse, subject to the debts of the decedent and to administration and disposal under the provisions of Division III of this code.'' (Italics added.)

Contestants conceded that they ''have no issue with the appellant with respect to the effect of Section 201.5 upon *personal property,* so long as it can be established that said personal property, wherever acquired, would not have been the separate property of either spouse if acquired while domiciled in the State of California, but do not concede that the proceeds from the sale of real property situated in a sister state, acquired after marriage, come within this classification.''

August Schnell by his last will executed on May 14, 1930, declared in paragraph 3 thereof that ''all property in which at date hereof I have any interest or which at this date stands in the name of myself or myself and wife is my separate property, except the homeplace which is the property of myself and wife in joint tenancy.''

By subdivision (a) of paragraph 4 of the will, decedent left all his personal effects to his wife; by subdivision (b) of the same paragraph he left one-half of his remaining estate to his wife, ''if she survive distribution thereof to her. If she dies prior thereto, then to her living heirs at law.'' After various bequests to relatives and friends, said testator by paragraph 5 of the will devised and bequeathed to his wife one-half of the residue of his estate, real and personal, wherever situate including all lapsed and failed legacies . . . provided she survives distribution thereof to her. Any portion thereof not distributed to her prior to her decease shall go to her living heirs at law determined according to the laws of succession of the State of California then in force relating to separate estates.''

At the hearing of the instant petition and the opposition thereto, testimony to the following effect was presented:

Anton Maier testified he had known August Schnell since 1913; that he met him in Los Angeles; that in 1918 or 1919 the Schnells moved to California, and that the witness and his wife and Mr. Schnell and his wife took many trips around

the country and in 1928 took a trip to Europe together; that during the time he knew him, Mr. Schnell was "sort of retired already; but before that time he had a business, a coffee business, selling coffee and tea" in Brooklyn; that Mr. Schnell told the witness that "when he came to this country he worked as a coal miner, and after that he worked as a grocery clerk, and then he started in peddling groceries himself and after that he had different business"; that he did not have much money at that time; that just before he was married he peddled groceries and slept in a barn; that "he (Mr. Schnell) told me that he had made money in Brooklyn by coffee and tea, and besides he did some clipping of coupons and so forth and made money. And then he speculated a good deal on the stock exchange. . . . After he was married." On cross-examination, the witness testified that Mr. Schnell "told me he was hard up at certain times. Q. When was he hard up at certain times? A. Well, when he got married. Q. That is just your conclusion, isn't it? A. That is my conclusion. . . . Q. Was his wife ever present when you were discussing about his financial affairs? A. Oh, yes, many a time; many a time. . . . Q. Did he tell you how much he came to California with? A. Oh, he had quite a sum of money there when he came to California. I know he speculated on the stock exchange and he had the business in Brooklyn; had property there, and houses there. Q. He had three houses, as a matter of fact, back there, didn't he? A. Yes. Q. And sold them and got somewhere around $40,000 for the three of them, is that right? A. I don't know. Q. You don't know how much, but you know he sold three houses? A. Three houses, yes. Q. And he brought the money from the sale of those houses out here. A. That is right, yes."

Mrs. Wilhelmina Bunde testified that she met the Schnells in 1927; that they were friends visiting back and forth and taking trips together; that both Mr. and Mrs. Schnell mentioned the fact that they were going to celebrate their golden wedding anniversary in May, 1943. In answer to the question: "Did Mr. Schnell ever say what business he was in when he was married?", the witness replied: "Well, I think they started the coffee business after they were married. I don't know what he was in before. Q. Did he tell you this. A. Yes. Q. Where was the coffee business? A. In Brooklyn. Q. Do you know whether this wife, Anna, helped him in that busi-

ness? A. Yes, she did. Q. What did she do, if anything? A. She was at the cash register. . . . The Court: This is what he told you? He told you she operated the cash register? A. Well, they both spoke of it together when he talked about it." This witness also stated that Mr. Schnell told her he made most of his money in the coffee business. "He said, 'That is where we made our money.' . . . she said, 'When I sat at the cash register on Saturday and the money came rolling in, I thanked the Lord for the money.' Q. Did he ever state what if any property or money he had when he was married? A. No. Q. Did he ever say anything about what they had accumulated since marriage? A. No; he didn't mention that." On cross-examination: "Did he ever tell you about having some real estate back there, Mrs. Bunde? A. Oh, yes. Q. And that it was sold? A. Well, I don't know about that. Q. You didn't know that it had been sold? A. No."

Martin Bunde, husband of the last witness, testified he had known the Schnells since 1927; that Mr. Schnell told him he made his money in the coffee business in Brooklyn and that his wife helped him. "I remember of him talking once when he said, 'I like a woman that can help me in my coffee business.' And he spoke of their working together. They had no children." In answer to the question: "Do you know whether or not he started the coffee business before or after he was married? Did he ever tell you?", the witness stated: "I think it was at the time that he was married . . . I don't recall a definite statement. But he was first a miner, and then he was a grocery clerk, and then I believe peddling groceries himself."

In the light of the above testimony regarding the acquisition of the deceased husband's property, it doubtless would have constituted community property had the Schnells been domiciled in California at the time such property was acquired, for it is clear that the husband had little or no property at the time of his marriage and also that his wife assisted him in accumulating the property thereafter acquired.

*Estate of Perkins,* 21 Cal.2d 561, 570 [134 P.2d 231], holds that sections 228 and 229 of the Probate Code apply to all property subject to probate proceedings in California, regardless of its prior status in a foreign jurisdiction; and that under these sections the personal estate of a decedent domiciled in California, which was acquired outside the state during the marital relationship, and in which a predeceased spouse had

some interest, may be reclassified under the law of the domicile for succession purposes, whether or not the foreign ownership is substantially the same as the property would have had if acquired in California.

With respect to the interpretation of the terms of section 201.5 *supra,* there appears in 31 California Law Review at page 334, a note to the following effect: ''In 1935 the legislature added to the Probate Code, under the designation of section 201.5, a succession statute specifically covering the rights of the surviving spouse in personal property acquired while the parties were domiciled elsewhere, which would not have been separate property if acquired while domiciled in this state. Unlike the earlier legislation which had been held unconstitutional, this statute did not purport to stamp the property with a 'community' label. Furthermore, it did not undertake to provide for rights of succession in anyone other than the surviving spouse. It attempted no extraterritorial extension of the provisions of section 228 of the Probate Code, which, on the death of the surviving spouse, provides for the succession to what had been community property during the lives of the two spouses. Four justices of the supreme court, however, (in *Estate of Perkins,* 21 Cal.2d 561 [134 P.2d 231]) were willing to overlook this omission and to reclassify the property according to California community property law categories. . . . ''

In the dissenting opinion of Mr. Justice Traynor, in the *Estate of Perkins, supra,* is the following comment regarding section 201.5, Probate Code: ''This section is based on the theory that succession to property acquired by a husband and wife before they were domiciled in this state should be subject to the rule governing the succession to property acquired by spouses domiciled here. It applies only in the case of a surviving spouse and does not extend to such cases as the present one involving heirs other than a surviving spouse. The Legislature was apparently not then ready to devise a provision comparable to section 201.5 that would apply to such situations.''

Since the proceeds of the real property sold in New York constituted the community property of the husband and wife herein, it appears that such property was subject to the provisions of section 201.5 of the Probate Code, in view of the fact that both husband and wife were domiciled in California

274

at the time of the husband's death. (*Estate of Perkins, supra.*)

For the reasons stated, the judgment appealed from is reversed.

Doran, J., and White, J., concurred.