[Civ. No. 16949.  Second Dist., Div. One.  May 26, 1949.]

Estate of ARTHUR BALL, Deceased. LYLA BROWN HOWE et al., Respondents, v. ALICE BAYLISS et al., Appellants.

Collins, Hastings & Johnson, Marshall Stimson and Noel Edwards for Appellants.

Henry H. Draeger and Louis Thomsen for Respondents.

DRAPEAU, J.—By a petition for determination of heirship, the heirs at law of Cathryn Braun Ball, the predeceased spouse of the intestate, Arthur Ball, seek distribution to them under sections 228 and 229 of the Probate Code of all of the separate property of Cathryn Braun Ball, and one-half of all of the community property of said predeceased spouse and decedent.

In opposition to such petition, the heirs at law of Arthur

Ball contend that the entire estate was decedent's separate property; hence they are entitled to distribution thereof, to the exclusion of the relatives of the predeceased spouse. (Prob. Code, § 225.)

Section 228, *supra*, provides: "If the decedent leaves neither spouse nor issue, and the estate, or any portion thereof was community property of the decedent and a previously deceased spouse, and belonged or went to the decedent by virtue of its community character on the death of such spouse, or came to the decedent from said spouse by gift, descent, devise or bequest, or became vested in the decedent on the death of such spouse by right of survivorship in a homestead, or in a joint tenancy between such spouse and the decedent or was set aside as a probate homestead, such property goes in equal shares to the children of the deceased spouse and their descendants by right of representation, and if none, then one-half of such community property goes to the parents of the decedent in equal shares, or if either is dead to the survivor, or if both are dead, in equal shares to the brothers and sisters of the decedent and their descendants by right of representation, and the other half goes to the parents of the deceased spouse in equal shares, or if either is dead to the survivor, or if both are dead, in equal shares to the brothers and sisters of said deceased spouse and to their descendants by right of representation."

It is conceded that Cathryn Braun and Arthur Ball were married on September 3, 1903, and that they moved to California in December of 1917; that Mrs. Ball died on October 26, 1933, and Mr. Ball died on November 12, 1946, leaving no surviving spouse or issue, and that the estate was then valued at $900,000. Neither party left a will.

Petitioners in an effort to prove that Mrs. Ball possessed a community interest in the estate here under review, presented evidence to the following effect:

Ella May Hall testified that she became acquainted with decedent at Beaver Falls, Pennsylvania, in about 1902; that when he married in 1903, he and his wife lived "in the other side of our house" which was a duplex, from that time until they bought the house next door in 1906 or 1907; that Standard Connecting Rod Company was organized in 1902 at which time J. T. Moltrup (husband of Mrs. Ball's sister) was general manager and decedent was secretary of said company; that in 1906, said witness Hall was employed as secretary to decedent; that decedent told her that he borrowed in 1901 or

1902 the sum of $2,000 from Alfred Leigh, with whom he was then living, in order to buy stock in Standard Connecting Rod Company; that decedent also told her that it was through the influence of J. T. Moltrup that he was able to secure the loan with which to buy 25 shares of the company's stock; that "he had said, many times . . . when I worked for him, that if it hadn't been for Mr. Moltrup, he never would have had a start. It was through Mr. J. T. Moltrup that he got his start. You see, Mr. Moltrup brought him from the Tile Works, to the Connecting Rod Company, and it was on account of Mrs. Ball being Mrs. Moltrup's sister. That was the whole thing." This witness further testified that in 1906 or 1907 decedent had not completed payments on the loan of $2,000 from Mr. Leigh; that many times in later years, Mrs. Ball told her that she saved in order to help her husband pay his indebtedness; that subsequent to 1917 decedent visited in Beaver Falls and on his last trip there at the time he sold his stock in Republic Steel he told the witness: "Now I have $125,000 which I am taking to California to invest. . . . Ella, I never allow a dollar to be idle. Every cent I have has to work for me. . . . I am going back and I am going to make a fortune."

On cross-examination this witness testified that decedent told her he had bought 25 shares of stock of the Standard Connecting Rod Company and that the $2,000 which he borrowed from Mr. Leigh was in part payment for those shares; that the records of the company showed that he owned 25 shares; and his own records showed that he owed Alfred Leigh $2,000 which he borrowed before he married, in the "latter part of 1901 or the early part of 1902"; that decedent told her he had bought 25 shares of stock with the $2,000 borrowed from Mr. Leigh; that decedent paid $25 or $30 per month on the loan.

Mrs. Anna Margaret Moltrup, sister of Mrs. Ball and the widow of J. T. Moltrup, testified that decedent terminated his employment with Standard Connecting Rod Company after it merged with the Standard Gauge Company about 1910 and to her knowledge was not again employed after that date; that he moved to California in 1917 where he made his permanent home.

William Albert Braun, a brother of Mrs. Ball, testified that after his sister married Mr. Ball in September, 1903, he worked for them, i.e., ran errands, made garden, cut the grass and raked the yard, for which he was paid only a few pennies, his sister commenting that "she had to be close, she had to save her money to pay off a debt"; that his father died in

1922 and each of the children including Mrs. Ball received in the neighborhood of $325 or $350 from his estate.

Contestants produced one witness, Mrs. Alice Bayliss, sister of decedent, Arthur Ball, who presented a letter written by her brother, dated Jan. 19, 1903, in which he makes reference to a loan made to him by the witness and her husband to wit: "I also enclose my twenty-four months note, dated Dec. 11th, 1902, for the amount of $750.00, with interest at 5% per annum, payable semi-annually, in accordance with our recent correspondence. Attached to the note you will find Standard Connecting Rod Co's stock certificates No. 2 and 22, for 2½ and 5 shares respectively, making a total of 7½ shares, par value of $100.00 each, to be held as collateral.

"However, I will be able to take care of this note when due, but it is best that you have this collateral so that in case anything happens to me it will make you secure. As you did not answer my question regarding the time you preferred me to make this note for, I made it twenty-four months, and trust you will find this satisfactory."

This witness testified that the note was paid but she did not recall when it was paid, whether in three or four years, but she thought that "Arthur Ball would have paid it up right away."

The court found, among other things, that decedent married Cathryn (Kate) Braun on September 3, 1903, and that they continuously thereafter resided in Beaver Falls, Pennsylvania, until December, 1917, when they removed to California, where they remained domiciled until their respective deaths; that when the parties married, decedent was in possession of not to exceed 25 shares of stock of Standard Connecting Rod Company, a corporation, of Beaver Falls, having a par value of $100 each, and at that date was indebted to Alfred Leigh, his landlord, in the sum of $2,000, and to his sister, Alice Bayliss, in the amount of $750, which sums he borrowed for the specific purpose of buying said stock; that all of said 25 shares of stock were paid for with savings from the earnings of decedent after marriage.

It was further found that said shares of Standard Connecting Rod Company stock, originally costing $2,500, by subsequent "mergers" with or "changes" into Standard Gauge Steel Company stock, then Union Drawn Steel Company stock, and, finally, Republic Steel Corporation stock, increased in value to from $100,000 to $125,000 at the time decedent and his said wife came to California in December, 1917.

That an investment in 1916 of $20,000 in 200 shares of stock of Moltrup Steel Products Company of Beaver Falls, produced over $100,000 in dividends in 30 years, and increased in par value, by stock dividends and some additional purchases, to $76,850 in the same period.

That decedent was a shrewd, miserly man, continually poring over his investments and always urging his money to increase and making shrewd investments; that his said wife added materially to his opportunity to invest and reinvest the proceeds of his wise investments by her extreme thrift and frugality in household and personal expenses, running the home on $5.00 per week (and then accounting to her husband therefor), and later, when they were worth a third of a million dollars, on $7.00 per week; that by 1938 the fortune had more than trebled; and that thereafter by transmutations, rents, issues and profits of assets acquired during the married life of decedent and his said wife, the assets increased to over $900,000 at the date of his death; that neither spouse acquired any property after marriage by gift, devise, bequest or descent, except that said wife received $325 or $350 from the estate of her father in 1922 or 1923.

That other than the 25 shares of stock purchased with borrowed funds before marriage, which borrowings were repaid after marriage, the entire estate of decedent consists of property, and the rents, issues and profits and transmutations of property acquired during the marriage; that all of said property, so acquired during marriage, belonged or went to decedent upon the death of his said wife, by virtue of its community character, or reclassification for purposes of succession as community property, or became vested in decedent on the death of such spouse by right of survivorship in joint tenancies between such spouse and decedent.

Based upon such findings, the court made its conclusions of law that petitioners, the relatives of Cathryn Braun Hall, are statutory heirs at law of decedent and entitled to succeed to an undivided one-half interest in the personal property of decedent in proportionate amounts pursuant to the laws of succession; and that contestants, as heirs at law of decedent, are entitled to succeed to an undivided one-half interest in the personal property of the estate and to all of the real property thereof, pursuant to the laws of succession of the state of California.

From the decree entered in accordance with such findings

and conclusions, this appeal is prosecuted by contestant heirs at law of decedent.

It is here contended by appellants that section 228 of the Probate Code is applicable only to property "which was community property of the decedent and a previously deceased spouse"; and that property acquired by a husband in a common law state as his separate property does not become community property by reason of its removal by the owner to California, either upon such removal or upon the death of the owner, or at any other time, but retains its original character. (*Kraemer* v. *Kraemer*, 52 Cal. 302; *Shumway* v. *Leakey,* 67 Cal. 458 [8 P. 12] ; *Estate of Burrows,* 136 Cal. 113 [68 P. 488] ; *Estate of Niccolls,* 164 Cal. 368 [129 P. 278] ; *Estate of Warner,* 167 Cal. 686 [140 P. 583] ; *Estate of Arms,* 186 Cal. 554 [199 P. 1053] ; *Estate of Thornton,* 1 Cal.2d 1 [33 P.2d 1, 92 A.L.R. 1343].)

In 1917, the Legislature redefined community property to include "real property situated in this state and personal property wherever situated, acquired while domiciled elsewhere, which would not have been the separate property of either (husband or wife) if acquired while domiciled in this state." (Civ. Code, § 164, as amended; Stats. 1917, ch. 581, p. 827.) Thereafter, in *Estate of Frees,* 187 Cal. 150, 155 [201 P. 112], it was held that the expanded definition was not to be construed retroactively, consequently it did not apply to property of married persons who had become domiciled in this state and brought their property here prior to the date of such amendment.

In 1923, section 164 was again amended by inserting the following italicized language so as to include "personal property wherever situated *heretofore or hereafter* acquired while domiciled elsewhere . . .," thus making it clear that retroactive application was intended. (Civ. Code, § 164, as amended; Stats. 1923, ch. 360, p. 746.)

"But power to legislate as to the character of property brought to this state prior to 1917 was again held wanting since it would abridge vested rights of the husband. (*Estate of Drishaus,* 199 Cal. 369, 373 [249 P. 515].)" Thereafter, in *Estate of Thornton,* 1 Cal.2d 1, 5 [33 P.2d 1, 92 A.L.R. 1343], "it was held that to attempt thus to convert separate property into community property even prospectively was an unconstitutional impairment of vested property rights acquired in another jurisdiction." (*In re Miller,* 31 Cal.2d 191, 196 [187 P.2d 722].)

The effect of the decision in the Thornton case was avoided by the enactment in 1935 of section 201.5 of the Probate Code, a statute of descent, declaring in substance that on death of a spouse one-half of all property that was acquired by parties elsewhere and that would not have been separate property if acquired in California shall go to the survivor.

In construing this section, the Supreme Court in *In re Miller*, 31 Cal.2d 191, 196 [187 P.2d 722], stated: "Unlike the earlier legislation which had been declared unconstitutional, this statute does not purport to rearrange property rights between living husbands and wives in marital property brought into this state upon their change of domicile to California. On the contrary, it is a succession statute apparently enacted in pursuance of the theory of the dissenting opinion in the Thornton case, that such legislation affecting the descent of property would not contravene constitutional guarantees since the rights of testamentary disposition and succession are wholly subject to statutory control (*Estate of Thornton, supra*, 1 Cal.2d 1, 7.)"

The court then proceeded to enumerate three possible interpretations suggested by the wording of the code section, and decided that interpretation (2) to the effect that the section "applies to personal property in that *form at death* which is derived from any property acquired while domiciled elsewhere which would not have been separate property if acquired while domiciled in California; . . . not only would conform as well with the express wording of the statute but would have the added advantage of giving a wider application to the section consistent with the recognized principles of property classifications prevailing under the law of this state. The statute relates to the disposition 'upon . . . death of . . . one-half of all personal property wherever situated . . .,' language evidencing that the reference is made to personal property at the time of death rather than at the time of acquisition. Such wording would reasonably include personal property that in California has been transmuted into another form of personalty at time of death. (*Estate of Schnell, supra*, 67 Cal.App.2d 268, 273-274 [154 P.2d 437].)"

Respondents contend that the *Estate of Perkins*, 21 Cal.2d 561 [134 P.2d 231], is decisive of the instant cause, for the reason that the controversy there turned upon the question as to whether sections 228 and 229 of the Probate Code applied to property acquired in common law state, which was brought

to California and the surviving spouse died while domiciled in California.

In construing sections 228 and 229 of the Probate Code, the court in *Estate of Perkins, supra,* at 569 stated: ''By these sections, . . . the Legislature intended that a lineal descendant of the predeceased spouse should succeed to all property of the surviving spouse in which the predeceased spouse owned an interest; if there were no lineal descendants of either spouse, the property should then be divided equally between the respective families of the two spouses by whose efforts it was accumulated. If, however, the property had originally come to the predeceased spouse by other means than his efforts during the existence of the marriage, such an acquisition before marriage, or by gift, devise or bequest subsequent to the marriage, then the Legislature intended that such property should descend, upon the death of the survivor, entirely to the family of the predeceased spouse. (See cases cited *supra.*)

''The only way in which that legislative purpose may be given effect is by applying sections 228 and 229 to all property subject to probate proceedings in California, regardless of its prior status in a foreign jurisdiction. Implicit in this construction, of course, is *the reclassification, for the purposes of succession only, of property acquired in the foreign jurisdiction in accordance with the community property law of California.* Although this court in *Estate of Thornton,* 1 Cal. 2d 1 [33 P.2d 1, 92 A.L.R. 1343], held that section 164 of the Civil Code was unconstitutional insofar as it purported to reclassify the property of a spouse who acquired it in a common-law state and later brought it to California, the decision was expressly limited to a reclassification during the lifetime of the spouse. . . .

''Under sections 228 and 229 of the Probate Code, the issue or kindred of the predeceased spouse are statutory heirs of the surviving spouse, and their rights under those sections do not vest until the death of the latter. (*Estate of Watts,* 179 Cal. 20, 23 [175 P. 415]; *Estate of Bixler,* 194 Cal. 585, 595 [229 P. 704].) The property acquired outside of this state during the marital relation is subjected to the laws of succession in California by the fact that, at the time of the death of the surviving spouse, he or she was domiciled within its borders; it may therefore be reclassified under the law of the domicile. In *Estate of Allshouse,* 13 Cal.2d 691 [91 P. 2d 887], this court held that, under section 229 of the Probate

Code, the origin of an estate may be traced into a foreign jurisdiction and the California classification of property applied to the property there acquired. But the decision was qualified by the requirement that the nature of the foreign ownership must be substantially the same as that which the property would have if acquired in this state. Upon a reconsideration of the reasoning of that case, it seems obvious that the limitation of section 229 to property, which, in the foreign jurisdiction, had substantially identical incidents to the clasisfication of property in a community property state has no reasonable foundation and is not consistent with the legislative intent expressed in sections 228 and 229 of the Probate Code. As those statutes affect succession only, their purpose is fully carried out if the probate court distributes the property upon the basis of its classification had it been acquired in California.''

The evidence adduced at the trial herein amply supports the trial court's findings:

''IV.   That decedent was in possession of, not to exceed 25 shares of stock of $100 par value, in the Standard Connecting Rod Company, a corporation, of Beaver Falls, Pennsylvania, at the time of his marriage to Kate Braun; that at the time of said marriage decedent was indebted to Alfred Leigh, his landlord, in the sum of $2,000, and to his sister, Alice Bayliss, in the sum of $750, which sums he had borrowed for the specific purpose of buying the stock; that all of said 25 shares of stock were paid for with savings from the earnings of decedent after marriage. . . .

''IX.   That other than the 25 shares of stock purchased with borrowed funds before marriage, which borrowings were repaid after marriage, the entire estate of decedent consists of property, acquired during the marriage of decedent and said wife, other than by gift, bequest, devise or descent (except that said wife inherited $325 to $350 as heretofore found) ; that all of said property, so acquired during marriage, belonged or went to decedent upon the death of his said wife, by virtue of its community character, or reclassification for purposes of succession as community property, or became vested in decedent on the death of such spouse by right of survivorship in joint tenancies between such spouse and decedent.''

Apropos to the instant cause is the following statement appearing in 3 California Jurisprudence, Ten-Year Supplement, page 511, section 31: ''If the husband or wife owned

an inchoate right to property before marriage, but paid the purchase price afterwards, the courts in the more recent cases apportion the property with reference to the original value and the value after the payment out of community funds. (*In re Caswell's Estate,* 105 Cal.App. 475 [288 P. 102]). See, also, *Vieux* v. *Vieux,* 80 Cal.App. 222, 229 [251 P. 640]; *Estate of Clark,* 94 Cal.App. 453 [271 P. 542]. So, where a husband owned a contract of purchase before marriage, and paid the installments of the purchase price during marriage, the property is community to the extent that community funds went into its purchase price, and it is separate property of the husband to the extent that his separate funds were used for its purchase. (*Vieux* v. *Vieux, supra.*)''

Applying the foregoing principles of law to the facts presented herein, the trial court properly reclassified, for the purposes of succession after the death of both husband and wife intestate, property acquired in a foreign jurisdiction in accordance with the community property laws of this state.

For the reasons stated, the judgment is affirmed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied June 10, 1949, and appellants' petition for a hearing by the Supreme Court was denied July 21, 1949. Traynor, J., voted for a hearing.